UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>E. HERBERT HAFEN,<br><br>　　　　　Defendant. | Civil Action No. _____<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant E. Herbert Hafen ("Hafen" or "Defendant"), alleges as follows:

### PRELIMINARY STATEMENT

1. From at least July 2011 through April 2018, Defendant, who was employed as an investment adviser representative and broker-dealer registered representative at two large well-known Financial Institutions ("Financial Institution A" and "Financial Institution B," collectively, "The Financial Institutions"), engaged in a scheme to defraud his clients. This scheme involved Hafen convincing his retail clients that he had access to a purported investment opportunity outside the financial institution where he worked. He advised clients that the supposed investment would pay an annual six percent return and had little risk. Hafen convinced his clients to take their money out of the Financial Institutions – including liquidating stock holdings and personal retirement accounts – deposit that money into their personal bank accounts, and then transfer or wire the money to Hafen's personal bank account. Once Hafen had the money from his clients, he pocketed it, using it, not for any investments, but for his own personal

purposes. While some of the victims received some or all of their money back, most of the money was never repaid. During the seven year scheme, Hafen took more than $1.6 million from 11 victims. Of the total $1.6 million, Hafen has returned approximately $650,000.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction pursuant to Sections 21(d)(3), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(3), 78u(e), and 78aa] and Sections 209(d), 209(e), and 214 of the Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14].

3.  Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because a substantial portion of the conduct alleged in this complaint occurred within the Southern District of New York.

4.  In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

## DEFENDANT

5.  Hafen, age 64, is a New Canaan, Connecticut resident who was employed by the Financial Institutions as an investment adviser representative and broker-dealer registered representative in New York, New York from January 2008 until March 2018 at Financial Institution A and from March 2018 at Financial Institution B until he was terminated in September 2018.

## FACTUAL ALLEGATIONS

6.  Beginning in 2011, Hafen launched a multi-year fraud against his brokerage and advisory clients that resulted in his taking approximately $1.6 million from 11 clients for supposed special investments. The Defendant exploited his fiduciary

relationship with these advisory clients and engaged in deceptive conduct in order to obscure his theft.

7.     Hafen's scheme relied on the trust that his clients placed with him as their financial adviser.  As part of his fraudulent scheme, during the course of an in-person or telephonic meeting with a client about the investment portfolio they held at one of the Financial Institutions, Hafen mentioned that he had a purported investment opportunity outside the Financial Institution.  Hafen claimed that this outside opportunity would perform better than the returns the client was currently seeing with the Financial Institution.  Hafen represented to his clients that he was offering this alleged investment only to a select few and told multiple clients – including, in one case, by email – that the investment was "safe, secure, and boring."

8.     In reality, there was no "outside investment" and there was nothing safe or secure about it.  Instead, Hafen pocketed all the money that he led his clients to believe was funding their outside investments.  He used his clients' money to pay for his house, his family's cars, and credit card expenses for himself and other family members.

**Hafen Starts His Scheme by Stealing from Five Clients**

9.     Hafen launched his scheme in the summer of 2011, when he persuaded five clients ("Clients A-E") to take money they had invested with Financial Institution A and send it to Hafen for him to "invest" on their behalf.

10.    From July 2011 through January 2018, Hafen convinced Client A, an octogenarian widow, to withdraw money from an IRA account at Financial Institution A (including, on one occasion, liquidating stock holdings), transfer it to her personal bank account, and then wire the funds to Hafen's personal bank account.  Client A had inherited the IRA from her husband in 2008 and, based on Hafen's representations, she expected it to support her for the remainder of her life.  Over a seven-year period, Hafen convinced Client A to wire $325,000 to him, which Hafen used to cover various living expenses.  For example, Hafen spent over $100,000 on credit card bills and to repay

another investor.  To avoid detection of his fraud and to lull Client A into thinking her funds were safe, in spring or summer of 2018 Hafen falsely told the client she had about $300,000 in her IRA.  In actuality, Client A's available funds were roughly half that amount, approximately $150,000.  In July 2018, soon after Hafen's false representation, Client A's daughter took over legal responsibility for her mother's finances due to her mother's deteriorating health.

11. In the spring of 2012, over the course of multiple in-person and telephonic conversations, Hafen persuaded Client B that he had a supposed investment that could help her diversify her portfolio.  Hafen assured Client B that the so-called investment was safe and that it would provide better returns than her investments with Financial Institution A.  Hafen advised Client B that the supposed investment couldn't be done through Financial Institution A and instead would require her to liquidate her holdings and move the cash out of Financial Institution A to her personal bank account before it could be "invested."  Following Hafen's advice, Client B liquidated her stock holdings and moved the money to her personal bank account.  Then, following Hafen's instructions, she made transfers from her bank account to Hafen's personal bank account.  From the spring of 2012 through the spring of 2013 Client B made eight transfers to Hafen's personal account, totaling $600,000.  Hafen led Client B to believe that he had invested her money with a fund and her purported investment was safely earning interest.  In reality, Hafen used Client B's money to pay his own living expenses.  For example, Hafen spent over $100,000 on mortgage and credit card payments.   Hafen has not returned any of Client B's money.

12. In August 2011, Hafen persuaded Client C to transfer $40,000 of money she had recently inherited from her mother and had placed with Financial Institution A to Hafen's personal account, in the belief that the money would be invested on behalf of Client C.  Instead of investing Client C's money, Hafen used the money for his own

personal purposes. For example, Hafen spent almost $20,000 on mortgage and credit card payments and luxury lodging.

13. In about 2011, Hafen also claimed to Client D that Hafen could offer him an investment opportunity that would have a higher return than the conservative low-interest-rate bonds in which Client D was already invested. Client D understood that, to take advantage of the so-called investment opportunity, she needed to send money for the investment directly to Hafen; nonetheless, Client D believed that the investment opportunity was still with Financial Institution A. Based on Hafen's representations, Client D wired $20,000, which was more than 20% of his investments with Financial Institution A, to Hafen on September 30, 2011. As with Clients A, B, and C, Hafen did not invest Client D's money, but rather used it for his personal expenses, including spending approximately half of Client D's invested amount on housing expenses.

14. In 2012, based on representations by Hafen, Client E believed that Hafen was offering him an opportunity to invest his money with a third party outside of Financial Institution A. On March 16, 2012, Hafen and Client E met to discuss the purported investment opportunity. That very same day, based on Hafen's advice, Client E and Hafen went to a branch of the bank Client E and Hafen shared. There, Client E transferred $25,000 to Hafen for the purported "investment" opportunity. As with Clients A, B, C, and D, Hafen did not invest Client E's money, but rather used it for his personal expenses, including spending over $10,000 on mortgage and credit card payments.

**Hafen Continues His Fraud by Deceiving Additional Clients and Stealing their Money**

15. Hafen also deceived a group of clients who were related to each other (collectively, the "Client F Family") with tales of his outside investment opportunity. As with the clients described earlier, Hafen stole the Client F Family's "investments" for his own and his family's use and did not invest the money.

16. The Client F Family included two brothers and three of their adult children who were all clients of Hafen's at Financial Institution A. Beginning in November 2011, Hafen proposed his "investment" opportunity to one of the brothers, who invested $35,000. Over the next six years, the three children (and a son-in-law) all invested with Hafen in this purported investment opportunity. In total, the Client F Family sent Hafen more than $170,000.

17. As with the clients described earlier, Hafen proposed to the Client F Family that they invest money in a purportedly safe investment outside of the Financial Institution where they held their money. After Hafen had convinced two of the Client F Family children to invest with him in May 2017, their father e-mailed Hafen looking for more detail. As with other defrauded clients, Hafen directed the father of these Client F Family children to use Hafen's wife's personal email to discuss the "investment." On June 1, 2017, the father of the two investor Client F Family children emailed Hafen asking for additional information memorializing the alleged investment since it was "not [his] typical investment." In response, on June 4, 2017, Hafen e-mailed from his wife's email account, claiming:

> Investment: short term loans
> Term: 3 years w/optional annual creditor put Feb.15 -
>   approximately 7 months until put exercise/maturity
> Rate: 6% floor non annualized with floating rate
>   increase provision - approximately 10.3% annualized
> Protection: first loss protection/ senior position
> Payment: annual interest payment (Feb.15); full
>   principle *[sic]* (upon put option exercise each Feb.15)
> Penalty: 1.5% per month after 30 days late
>
> Can be terminated by debtor prematurely with full
>   annual interest payment
>
> This is safe, secure, and boring.

These terms were a fiction. In reality, Hafen was using the Client F Family's money to pay for his personal expenses and was in no way investing or securing that money. For example, Hafen spent over $40,000 on mortgage, student loan, and credit card payments.

18. Hafen, in a further effort to conceal his fraud, mailed one of the Client F Family brothers a fraudulent post-investment "investor statement" that purported to show the money he had allegedly earned to-date on the "investment." The statement and supposed money growth were fabricated by Hafen. The statement purported to be from an entity called "E&N Investments," which may be a play on Hafen's given name, Elias Niggebrugge, and appears to be a made-up entity. Hafen used these bogus documents to lull investors into believing their money was safe, when instead Hafen had stolen it for his own use.

### Hafen Persuades Two More Clients to "Invest" their Money, Totaling More Than $500,000

19. In August 2015, Hafen – using the same tactics he used with his other victims – convinced another client (Client G) to send money to his investment scheme. Hafen convinced Client G that he would receive a 6-8% return on the "investment." From 2015 through 2017, Client G sent $195,500 to Hafen to invest. As with his other victims, Hafen touted that that his investment would pay better returns than what Client G was receiving at Financial Institution A. Instead of "investing" Client G's money, Hafen used over $100,000 to make credit card, mortgage, and student loan payments.

20. Using the same tactics, and telling the same story as with earlier clients, Hafen advised Client H about an "investment" opportunity that he claimed he had offered exclusively to only about 10 or so friends. Hafen informed Client H that Financial Institution A did not want to be involved with the purported investment and, in order to take advantage of the opportunity, Client H would need to send his money to Hafen's personal account. Based on Hafen's claims about the alleged investment and its returns, Client H transferred $250,000 to Hafen, who then used Client H's money to cover various living expenses. For example, Hafen used over $100,000 to make credit card and mortgage payments.

**Hafen Changes Financial Institutions and His Fraud is Uncovered**

21.     In the summer of 2018, Financial Institution B learned that one of its clients had sent money directly to Hafen and opened an investigation into the matter. Hafen admitted to Financial Institution B that he had entered into financial arrangements with clients that were not approved by the firm.  Hafen also admitted that the clients likely believed that they were taking advantage of an investment opportunity, rather than sending money to Hafen for his personal use.  Financial Institution B terminated Hafen.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**(Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Thereunder by Defendant)**

22.     The Commission incorporates and realleges here paragraphs 1 through 21, above.

23.     Defendant has, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

24.     By reason of the foregoing, Defendant has directly or indirectly violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### SECOND CLAIM

**(Violations of Sections 206(1) and 206(2) of the Advisers Act by Defendant)**

25. The Commission incorporates and realleges here paragraphs 1 through 21, above.

26. By engaging in the conduct described above, Defendant, while acting as an investment adviser, by use of the means of an instrumentalities of interstate commerce or the mails, directly or indirectly:

    a. Employed devices, schemes, or artifices to defraud clients; and,

    b. Engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients.

27. By reason of the foregoing, Defendant directly or indirectly, singly or in concert, has violated, and unless enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Make findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendant named herein committed the violations alleged herein.

### II.

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining the Defendant from violating, directly or indirectly, the laws and rules alleged in this Complaint to have been violated

### III.

Order Defendant to disgorge his ill-gotten gains in an amount according to proof, plus prejudgment interest thereon.

IV.

Order Defendant to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(e)].

V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VI.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Dated:  September 4, 2019                On behalf of the Commission,
        Boston, Massachusetts

/s/ Alicia M. Reed
_____

Alicia M. Reed (NY Bar # 4913596)
Rachel E. Hershfang* (MA Bar # 631898)
Eric M. Brooks* (CA Bar # 209153)
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8816 (Brooks)
BrooksE@sec.gov

*Not Admitted in the S.D.N.Y